1  GERALD C. STERNS (State Bar No. 029976)
   STERNS & WALKER
2  825 Washington Street, Suite 305
   Oakland, CA 94607
3  Telephone: (510) 267-0500
   Facsimile:   (510) 267-0506
4  Email: sterns@trial-law.com

5  Arthur Alan Wolk
   John J. Gagliano
6  The Wolk Law firm
7  1710-12 Locust Street
   Philadelphia, PA  19103
8  T: 215-545-4220
   F: 215-545-5252
9  Pro hac vice application pending

10 Attorneys for Plaintiffs

11

12                   UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                    SAN FRANCISCO DIVISION

15

16  RUBEN VALLERO and BELEN VALLERO        )
                                           )   CASE NO. _____
17            Plaintiffs,                  )
                                           )   CIVIL ACTION COMPLAINT
18  v.                                     )
                                           )   DEMAND FOR JURY TRIAL
19  ASIANA AIRLINES, INC., and THE BOEING  )
    COMPANY,                               )
20                                         )
                                           )
21            Defendants.                  )
    _____)

22

23                    **CIVIL ACTION COMPLAINT**

24      Plaintiffs, RUBEN VALLERO and BELEN VALLERO (collectively "Plaintiffs")

25  through their attorneys bring this action against ASIANA AIRLINES, INC. ("ASIANA") and

26  THE BOEING COMPANY ("BOEING") (collectively "Defendants") and state as follows:

27      1. This action arises from the crash of a BOEING 777-200ER model airliner with

28  Korean registration mark HL7742 (the "accident aircraft") operated by ASIANA as

                                    -1-

Flight 214 that departed from Inchon International Airport, Seoul, Korea and crashed attempting arrival at San Francisco International Airport ("SFO"), located in San Francisco, California on July 6, 2013.

## JURISDICTION

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises under a treaty of the United States, specifically Article 33 of the Convention for the Unification of Certain Rules for International Carriage by Air (the "Montreal Convention"), which both the United States and the Republic of Korea have ratified.

3. As a party to the International Air Carrier Transport Association Intercarrier Agreement, Defendant ASIANA is a signatory to the Montreal Convention.  Under Article 33, sections (1) and (2) of the Montreal Convention, Plaintiffs were passengers on board ASIANA Flight 214 and they purchased their tickets in the Northern District of California.

4. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiffs are citizens and residents of California, and residents of this District.  Defendant ASIANA is a foreign corporation existing under the law of the Republic of Korea and this District. Defendant BOEING is a corporation organized and existing under the laws of Delaware with its Principle Place of Business in the State of Illinois.  Boeing also maintains corporate offices in the Northern District of Illinois and in this District and the amount in controversy exceeds the jurisdictional amount.

## VENUE

5. Venue is proper in this Division pursuant to Local Rule 3-2(c) because a substantial

part of the events or omissions which give rise to Plaintiffs' claims occurred in the Northern District of California.

## THE PARTIES

6. Plaintiff, RUBEN VALLERO, is a citizen and resident of the United States and of California.

7. Plaintiff, BELEN VALLERO, is a citizen and resident of the United States and of California.

8. Plaintiffs are married to each other. Plaintiffs were passengers on board ASIANA Flight 214 bound for SFO when their BOEING aircraft crashed on July 6, 2013 (the "ASIANA crash").

9. Defendant ASIANA is a corporation with its principal place of business in Seoul, Korea. At all times material, ASIANA is and has been a business that is registered with the California Secretary of State with an active status, entity number C1688917. ASIANA maintains an agent in California at 3530 Wilshire Boulevard, Suite 1700, Los Angeles, California 90010.

10. ASIANA is an airline that is engaged in the common carriage of passengers in aircraft for profit.

11. ASIANA entered into a contract of carriage with Plaintiffs and at all times material ASIANA was in control of, and responsible for, Plaintiffs' safe air transport to San Francisco, California.

12. Defendant BOEING is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Illinois. At all times material, BOEING is and has been a business that is registered with the California

Secretary of State with an active status, entity number C0367504. BOEING maintains an agent in California at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California.

13. BOEING designed, tested, certified, advertised, manufactured, sold and/or supplied the accident aircraft to ASIANA and contacted to train ASIANA pilots including the pilots of the ASIANA crash.

14. At all times material ASIANA and BOEING and their employees, officers, directors, predecessors, successors, contractors, or other agents were joint venturers with each other, were acting in concert with each other and/or were agents of each other such that the actions and/or omissions of each defendant was authorized, adopted and/or approved by the other defendant.

## FACTUAL BACKGROUND

### THE ASIANA FLIGHT 214 CREW

15. The Captain of ASIANA Flight 214 was an experienced pilot but with little pilot-in-command time in the BOEING 777-200ER aircraft.

16. The Captain of ASIANA Flight 214 was flying with a Line Check Airman so that he could upgrade to the BOEING 777-200ER aircraft from the Airbus aircraft that he previously flew.

17. The Line Check Airman was seated in the right seat, or copilot seat, of ASIANA Flight 214 and there was a First Officer in the jump seat.

18. The purpose of the Line Check Airman is to ensure the safety of the flight by observing and correcting as necessary the performance of the pilot flying in this case the Captain.

19. As a copilot as well, the copilot/Line Check Airman is to ensure that all required call outs, cross checks and safety procedures are followed by the Captain and to intervene as necessary using Cockpit Resource Management techniques to ensure the safety of the flight.

20. The purpose of the First Officer is to offer such information as is appropriate as he observed the performance of the Captain and Line Check Airman in this training environment to ensure the safety of the flight.

21. ASIANA, complying with BOEING-endorsed training for the accident aircraft violated one of the principal rules of aviation safety and that is the flight crew must understand the operation of the aircraft regardless of its complexity.

22. BOEING violated one of the cardinal rules of aircraft design which was that an aircraft must be designed so that it can be flown by a pilot of ordinary flying skills.

23. The training information provided by BOEING was lacking in that it did not adequately explain the interface and interrelationship between the auto-throttles and autopilot and did not adequately establish procedures for ensuring an error-free transition between automated flight and the pilots flying the aircraft manually or "by-hand."

24. The training information provided by BOEING was also lacking in that it did not emphasize the disconnection of automation when incompatible autopilot/auto-throttle modes were selected by the flight crew.

**25.** ASIANA allowed its flight crews to incorrectly set the cockpit displays and aircraft automation during a visual approach.

**26.** ASIANA did not ordinarily allow its pilots the experience of flying the aircraft manually, without automation, or "by hand" before the last 1,000 feet of an approach.

**27.** The fly "by hand" mindset and training were sorely lacking at ASIANA through its compliance with BOEING recommended training for the BOEING 777-200ER aircraft which neglected to ensure a complete understanding of the 777-200ER systems before allowing a flight crew to fly passengers on a long, exhausting overseas flight such as ASIANA Flight 214.

**28.** The training environment at ASIANA prompted by BOEING also failed to consider the importance of a change to the approach environment from the traditional, repeatable and routine Instrument Landing System ("ILS") to the visual approach procedure.

**THE BOEING 777-200ER AIRCRAFT SYSTEMS IMPLICATED**

**29.** Two critical components in this disaster were the BOEING 777-200ER autopilot and auto-throttles (the "automated systems" or "automation").

**30.** Another critical component was the low-energy warning system that was designed only for cruise flight, not for approach and landing when low-energy is most likely to occur and is most critical for the aircraft because it is so close to the ground.

**31.** The autopilot in the BOEING 777-200ER is one of the most sophisticated in any aircraft and the auto-throttles operate similarly but somewhat independently.

32. The auto-throttle system was not accompanied by sufficient cockpit warnings about the propensity for the auto-throttle system to enter a "hold" mode where it ceased providing automated power settings for the accident aircraft's engines.

33. It is that independent auto-throttle operation as well as the operations of the flight crew to reset the pilot displays to accommodate the visual approach as well as the flight crew's lack of understanding of how they all interfaced which set the stage for this accident.

34. The automated systems had caused confusion and dangerous near-misses to other pilots and aircraft long before this accident.

35. Complicating the process was the BOEING 777-200ER autopilot and auto-throttle architecture which, while not unlike other sophisticated aircraft of the past 15 years, was an automation-induced accident waiting to happen.

36. The philosophy of aircraft automation design has evolved to the point where the flight crew becomes a systems manager for the airplane's electronic systems rather than a pilot physically manipulating the aircraft's controls in order to get the flight to its destination.

37. The flawed logic in aircraft automation in general and the automation in the BOEING 777-200ER in particular is that flight crews are taught to disconnect the automation when operations are not working as planned and fly the aircraft "by hand" yet they do not receive adequate training or practice in flying the aircraft "by hand" and the crew of ASIANA Flight 214 were sorely lacking in such training and practice leading to this accident.

**THE ACCIDENT FLIGHT**

**38.** As the accident aircraft approached SFO on July 6, 2013 at about 11:28 a.m. Pacific Time, the weather was clear and Visual Meteorological Conditions ("VMC") prevailed in the SFO area.

**39.** As the accident aircraft approached SFO, visual approaches were in use which means that instead of using electronic means to control glide path and lateral course the crew would instead have to fly the aircraft through visual reference to the runway.

**40.** The accident aircraft was cleared for a "visual approach" to Runway 28 Left by air traffic control and the aircraft, piloted by the ASIANA Captain and copiloted by the ASIANA Line Check Airman, intercepted the final approach course to Runway 28 Left about 14 nautical miles from SFO.

**41.** While visual approaches are not an unusual occurrence at airports that are experiencing good weather, visual approaches for the crew of ASIANA Flight 214 were unusual and not a familiar procedure.

**42.** The visual approach procedure on the day of the accident changed the approach environment for ASIANA Flight 214 and the impact of the visual approach procedure on the BOEING 777-200ER aircraft can and did result in confusion and this is especially true in the training environment of ASIANA Flight 214.

**43.** As the accident aircraft approached SFO, the Captain engaged the auto-throttles to maintain and appropriate approach speed.

**44.** The speed selected was too fast for use of appropriate flaps for that segment of the approach.

**45.** The aircraft soon got too high on the glide path.

**46.** The autopilot was used to descend the aircraft rapidly to regain the proper glide path

**47.** Thinking that the auto-throttles would remain where set, the crew sequentially reset their displays for a visual approach and set throttles to idle which disabled the auto-throttles.

**48.** The aircraft continued to descend through the appropriate glide path and began to slow because the auto-throttles were no longer working to maintain the set speed.

**49.** The Captain set the correct missed approach altitude but failed to understand that selecting an auto-pilot mode that was inappropriate for that approach procedure the aircraft would try to climb to the missed approach altitude instead of descending to the runway.

**50.** Since the auto-throttles weren't working as the aircraft pitched up to climb, the speed dropped precipitously and the aircraft started to sink towards the runway.

**51.** The accident aircraft did not provide the pilots with any warning that the aircraft was slow because the low-energy warning system was designed for cruise flight and not for approaches to an airport.

**52.** Runway 28 Left at SFO is elevated above the San Francisco Bay and a sea wall sits at the end of the runway such that arriving aircraft are supposed to overfly the San Francisco Bay, then overfly the sea wall then land on Runway 28 Left.

**53.** The combination of poor automated system design, the lack of adequate training and lack of appropriate warnings led to the accident aircraft arriving at the SFO airport dangerously low and slow such that the aft end of the accident aircraft was below the runway and impacted the sea wall causing the accident aircraft to crash before the it was able to safely land on Runway 28 Left.

**54.** The Training Check Airman and First Officer did not timely react, warn the Captain or take over the aircraft from the Captain and the landing gear and aft fuselage struck the sea wall, the aircraft broke apart twisted wildly in the air and slammed into the tarmac with a force that tore seats loose, dropped overhead bins onto the passengers, ejected passengers from the aircraft, caused seat belt injuries to the passengers, slammed the passengers into each other and aircraft interiors, and caused a post -crash fire that engulfed the passenger compartment.

**55.** After the post-crash fire began, the pilots of the accident aircraft wrongly instructed the surviving passengers to remain in the accident aircraft even though Federal Aviation Administration ("FAA") policy is that aircraft such as the accident aircraft must be designed to be evacuated within 90 seconds.

**56.** Due to the pilots' defective instructions to the passengers and crew, the accident aircraft took much longer than 90 seconds to evacuate.

**PLAINTIFFS' DAMAGES**

**57.** Plaintiffs were two of the 291 passengers onboard the accident aircraft.

**58.** When the accident aircraft hit the sea wall and then lifted into the air, Plaintiffs experienced severe physical jolting in their seats, they were flung around and sustained physical injuries.

**59.** When the accident aircraft came to a stop, Plaintiffs saw and smelled smoke and heard people screaming in different languages.

**60.** Passengers including Plaintiffs were required to step over the chaotic mass of debris and each other to exit the aircraft while confused and misdirected fire crews ran over some survivors and nearly missed others in their blind zeal to put out the fire.

61. Plaintiffs exited the accident aircraft by jumping on a deployed escape slide and their fear caused them to run away from the accident aircraft and they looked back to see flames engulfing the accident aircraft's hull.

62. Plaintiffs received triage for their injuries at SFO and were later transported to the Stanford University Hospital where it was determined that Plaintiff RUBEN VALLERO suffered from a broken 11th rib and a resulting liver laceration.

63. At the Stanford University Hospital Plaintiff BELEN VALLERO was immediately taken to the Intensive Care Unit ("ICU") with a diagnosis of liver laceration and a left lower lobe pulmonary embolus.

64. When Plaintiff BELEN VALLERO was taken to the ICU, her husband, Plaintiff RUBEN VALLERO was terrified that he would never see her again.

65. As a result of the ASIANA crash, Plaintiffs have suffered physical injuries as well as psychological and emotional injuries with physical manifestations.

66. The nightmare of ASIANA Flight 214 was over but for the passengers including the plaintiffs who relive it every day.

67. Plaintiff RUBEN VALLERO suffered injuries as a result of the crash that include but are not limited to a lacerated liver, musculo-skeletal injuries post- traumatic stress disorder any and all of which are permanent and any and all of which have caused him pain and suffering, have impaired his earning power and capacity, have interfered with his usual duties pastimes and occupation and have caused him to lose the consortium and life's pleasures of his relationship with his wife and family.

68. Plaintiff BELEN VALLERO is the wife of RUBEN VALLERO and as a result of the accident she suffered a lacerated liver, injuries to her chest, ribs and lungs, musculo-

skeletal injuries, injuries to her nerves and nervous system, post- traumatic stress disorder, any and all of which may be permanent, and any and all of which have caused her great pain and suffering, have interfered with her enjoyment of her relationship with her husband and family, consortium and life's pleasures any and all of which will be permanent.

### COUNT I
### *NEGLIGENCE*
### *(Plaintiffs v. ASIANA)*

69. Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth herein.

70. At all times material, ASIANA was a common carrier engaged in the business of providing air transportation for fare-paying passengers on flights to and within the United States.

71. Pursuant to the Federal Aviation Regulations contained within Title 14 of the Code of Federal Regulations, ASIANA held an Air Carrier Operating Certificate that authorized it to serve as a common carrier engaged in air transportation in the United States.

72. ASIANA had a common law duty to maintain and operate aircraft including the accident aircraft with the highest degree of safety and care.

73. ASIANA, as a common carrier, owed the passengers of ASIANA Flight 214 including Plaintiffs the duty of utmost care and vigilance for safe transport.

74. ASIANA breached its duties and was otherwise negligent, grossly negligent, reckless, and/or acted intentionally in that it:

    a. failed to operate the accident aircraft safely;

b.   failed to ensure that its pilots and crew were properly trained;

c.   failed to ensure that its pilots and crew had appropriate experience or practice;

d.   failed to ensure that its pilots and crew were properly equipped;

e.   failed to ensure that proper procedures were in place;

f.   failed to ensure that its pilots and crew adhered to proper procedures;

g.   failed to adhere to the regulations contained within Title 14 of the Code of Federal Regulations; and

h.   failed to fulfill its duties in other respects to be shown at trial

75. As a direct and/or proximate result of ASIANA's acts, omissions and/or breaches of its duties, Plaintiffs were physically injured, emotionally injured, economically injured and suffered damages in excess of the statutory amount and they will continue to suffer from their injuries and suffer damages for the foreseeable future.

WHEREFORE, Plaintiffs seek judgment against Defendants, jointly and severally, for compensatory or general damages, for past and future medical care and expenses and incidental expenses, for past and future loss of earnings and earning capacity, for loss of personal property, for punitive damages and attorneys' fees and costs incurred in bringing this suit and for pre- and post-judgment interest on all damages under applicable law and for such other relief as they may be entitled under applicable law or as the Court may deem just and proper.

## COUNT II
### NEGLIGENCE PER SE
### (Plaintiffs v. ASIANA pursuant to the Montreal Convention)

76. Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth herein.

77. The Montreal Convention is an international treaty governing international carriage of passengers by air.  Both the Republic of Korea, the country of origin of ASIANA

Flight 214, and the United States, the country of destination of ASIANA Flight 214, are signatories to the Montreal Convention.

78. ASIANA was in control of Flight 214 and owed non-delegable duties to all passengers, including Plaintiffs, for the flight's safe operation at all times.

79. Pursuant to Article 17 of the Montreal Convention ASIANA, as a common air carrier, is liable for damages sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

80. The injuries sustained by Plaintiffs took place on board the accident aircraft.

81. Pursuant to Article 17 of the Montreal Convention, ASIANA is liable for damages sustained by Plaintiffs as passengers on board ASIANA Flight 214 because Plaintiffs' injuries occurred while they were on board the accident aircraft and/or in the course of the operations of disembarking from the accident aircraft.

82. ASIANA is also liable for all damages suffered by Plaintiffs in that Plaintiffs' claims derive from damages suffered by them as passengers on board ASIANA Flight 214 and/or in the course of the operations of disembarkation and are cognizable under California law.

83. ASIANA breached its duties and was otherwise negligent in that it:

    a. failed to operate the accident aircraft safely;

    b. failed to ensure that its pilots and crew were properly trained;

    c. failed to ensure that its pilots and crew were properly experienced;

    d. failed to ensure that its pilots and crew were properly equipped;

    e. failed to ensure that proper procedures were in place;

f.   failed to ensure that its pilots and crew adhered to proper procedures;

g.   failed to adhere to the regulations contained within Title 14 of the Code of Federal Regulations; and

h.   failed to fulfill its duties in other respects to be shown at trial.

84. As a direct and/or proximate result of ASIANA's acts, omissions and/or breaches of its duties, Plaintiffs were physically injured, emotionally injured, economically injured and suffered damages.

85. Pursuant to the Montreal Convention, ASIANA's liability is absolute up to the amount of 113,100 Special Drawing Rights ("SDR") pursuant to the Montreal Convention Article 21(1).

86. Pursuant to the Montreal Convention ASIANA is liable for all of Plaintiffs' damages unless ASIANA proves that (a) Plaintiffs' injuries were not due to the negligence or other wrongful act or omission of ASIANA; or (b) the injuries were solely due to the negligence or other wrongful act or omission of a third party.

87. As a direct and/or proximate result of ASIANA's acts, omissions and negligence, gross negligence, recklessness, and/or intentional actions through the pilots and flight crew of ASIANA Flight 214 and through the inadequate training and supervision ASIANA provided to the pilots and crew which caused the ASIANA Crash, Plaintiffs were physically injured, emotionally injured, economically injured and suffered damages in excess of the statutory amount and they will continue to suffer from their injuries and suffer damages for the foreseeable future.

WHEREFORE, Plaintiffs seek judgment against Defendants, jointly and severally, for compensatory or general damages, for past and future medical care and expenses and incidental

expenses, for past and future loss of earnings and earning capacity, for loss of personal property, for punitive damages and attorneys' fees and costs incurred in bringing this suit and for pre- and post-judgment interest on all damages under applicable law and for such other relief as they may be entitled under applicable law or as the Court may deem just and proper.

### COUNT III
*NEGLIGENCE*
*(Plaintiffs v. BOEING)*

88. Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth herein.

89. At all times material, BOEING was the designer, tester, certifier, advertiser, manufacturer, seller and/or supplier of the accident aircraft. As such, BOEING had the duty to ensure that the accident aircraft was suitable for passenger transport.

90. At all times material, BOEING was required to ensure that the accident aircraft complied with the requirements of Title 14 of the Code of Federal Regulations.

91. At all times material, BOEING designed, tested, certified, advertised, manufactured, sold and/or supplied the accident aircraft with automation systems that were not safe, that were unreasonably defective and that caused the accident aircraft to be unsafe and unreasonably defective.

92. At all times material, BOEING knew, or should have known, that the automation systems installed on the accident aircraft were likely to cause confusion, had caused confusion in the past and were installed without adequate instructions, training or warnings.

93. At all times material, BOEING knew, or should have known, that the low energy warning installed on the accident aircraft was not effective when the accident aircraft

was on approach to an airport which is when such a system is needed critically because of the aircraft's close proximity with the ground.

94. At all times material, BOEING knew, or reasonably should have known, that pilot or aircrew confusion about the accident aircraft's automation systems and/or the low energy warning system could result in catastrophe, serious injury and the tragic loss of human life.

95. At all times material, BOEING issued manuals, instructions and warnings for the operation of the accident aircraft that it knew, or should have known, were misleading, confusing and which did not give proper guidance to pilots and air crew.

96. At all times material, BOEING issued manuals, instructions and warnings for the operation of the accident aircraft that it knew, or should have known, were misleading, confusing and which did warn pilots or aircraft about the potential failure modes of the aircraft and its systems or the consequences of such failures.

97. Despite BOEING's actual knowledge, constructive knowledge, and/or knowledge that it reasonably should have obtained before the ASIANA Crash, BOEING did not change, alter or otherwise remedy automation systems and the low energy warning systems of the accident aircraft even though there were prior reports about problems with those systems.

98. Despite BOEING's actual knowledge, constructive knowledge, and/or knowledge that it reasonably should have obtained before the ASIANA Crash, BOEING did not properly train, instruct, or warn the pilots of the accident aircraft about the potential for catastrophe which was likely to occur and which actually did occur to the accident aircraft on July 6, 2013.

**99.** As a direct and/or proximate result of BOEING's acts, omissions and negligence, gross negligence, recklessness, and/or intentional actions Plaintiffs were physically injured, emotionally injured, economically injured and suffered damages in excess of the statutory amount and they will continue to suffer from their injuries and suffer damages for the foreseeable future.

**100.** Despite BOEING's actual knowledge, constructive knowledge, and/or knowledge that it reasonably should have obtained before the ASIANA Crash, BOEING did not properly train, instruct, or warn the pilots of the accident aircraft about the potential for catastrophe which was likely to occur and which actually did occur to the accident aircraft on July 6, 2013.

**101.** As a direct and/or proximate result of BOEING's acts, omissions and negligence, gross negligence, recklessness, and/or intentional actions Plaintiffs were physically injured, emotionally injured, economically injured and suffered damages in excess of the statutory amount and they will continue to suffer from their injuries and suffer damages for the foreseeable future.

WHEREFORE, Plaintiffs seek judgment against Defendants, jointly and severally, for compensatory or general damages, for past and future medical care and expenses and incidental expenses, for past and future loss of earnings and earning capacity, for loss of personal property, for punitive damages and attorneys fees and costs incurred in bringing this suit and for pre- and post-judgment interest on all damages under applicable law and for such other relief as they may be entitled under applicable law or as the Court may deem just and proper.

## COUNT IV
### *STRICT LIABILITY*
### *(Plaintiffs v. BOEING)*

**102.** Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth herein.

**103.** BOEING is a designer and seller within the context of strict liability in tort in that BOEING designed, tested, engineered, certified, manufactured, supplied and/or sold the accident aircraft, model 777-200ER, as well as all of its systems, sub-systems, components and parts and operation and maintenance instructions.

**104.** Plaintiffs make this claim against BOEING under the theory of strict liability in that:

    a.  the defects in the accident aircraft existed at the time the aircraft was built and sold, manufactured and designed; and

    b.    the defects in the accident aircraft existed at the time the aircraft was distributed; and

    c.    BOEING failed to warn of the defects in the accident aircraft; and

    d.    the defects in the accident aircraft, its warnings and its instructions were a direct and/or proximate cause of the accident that caused the injuries and damages set forth in this Complaint

**105.** At all times material, the aircraft and its systems including the autopilot system, auto-throttle system and low energy warning system were defective, resulting in an unreasonably dangerous condition which was a substantial factor in, and the direct and/or proximate cause of, the crash of the accident aircraft.

**106.** The accident aircraft, its autopilot system, its auto-throttle system and its low energy warning system were designed, manufactured, tested, certified, integrated, assembled, installed, distributed, supplied and/or sold by BOEING in a defective and unreasonably dangerous condition.

**107.** The defective and unreasonably dangerous condition resulted from defective design, manufacture, integration, assembly, installation and/or failure to provide adequate warnings or instructions including but not limited to:

a.     the unsafe and defective design and manufacture of the automation systems;

b.     the unsafe and defective architecture of the automation systems;

c.     the unsafe and defective integration of the automations systems;

d.     the unsafe and defective instructions about the automation systems;

e.     the unsafe and defective failure to warn about the operation of the automation systems;

f.   the unsafe and defective design and manufacture of the low energy warning system;

g.   the unsafe and defective architecture of the low energy warning system;

h.   the unsafe and defective instructions about the low energy warning system;

i.   the unsafe and defective failure to warn about the operation of the low energy warning system;

**108.**     As a direct and/or proximate result of the defective and unreasonably dangerous condition of the accident aircraft and its components and systems, Plaintiffs were physically injured, emotionally injured, economically injured and

suffered damages in excess of the statutory amount and they will continue to suffer from their injuries and suffer damages for the foreseeable future.

WHEREFORE, Plaintiffs seek judgment against Defendants, jointly and severally, for compensatory or general damages, for past and future medical care and expenses and incidental expenses, for past and future loss of earnings and earning capacity, for loss of personal property, for punitive damages and attorneys' fees and costs incurred in bringing this suit and for pre- and post-judgment interest on all damages under applicable law and for such other relief as they may be entitled under applicable law or as the Court may deem just and proper.

Demand is made for trial by jury on behalf of Plaintiffs.

January 13, 2015                           STERNS & WALKER

                                            THE WOLK LAW FIRM

                                        BY_____
                                            Gerald C. Sterns
                                            Attorneys for Plaintiffs